THOMAS ROBERTS, adm'r. of LAVINIA ROBERTS, dec'd, RACHEL B. LYON, WILLIAM LYON, GEORGE A. LYON, JOHN LYON and JACOB B. LYON, infant, by his next friend, WILLIAM LYON,

*vs.*

JAMES BROOM, JOHN LOWBER, assignee in trust, et al.

*New Castle, July T.* 1831.

An executor and trustee under a will, having in his hands funds bequeathed to legatees on certain trusts, purchased real estate. Subsequently to the purchase, sundry judgments were recovered against the trustee, which became liens upon the real estate so purchased. The trustee afterwards becoming insolvent, some of the legatees, whose legacies remained unpaid, filed a bill in equity, alleging that the real estate had been purchased with the trust funds, and claiming that a trust resulted to the unpaid legatees. *Held,* that the evidence was not sufficient to prove that the trust funds were applied to the purchase. But *held also,* that supposing the trust funds were so applied, and that a trust resulted therefrom, as between the legatees and the trustee and his assigns, yet that such trust could not avail against the legal rights of the judgment creditors.

BILL IN EQUITY TO ENFORCE A TRUST OF REAL ESTATE.— Jacob Broom, deceased, being in his lifetime seised of real and personal estate, by his will dated April 10th, 1810, directed that the residue of his real estate should be sold, and the proceeds thereof, together with the unappropriated balance of his personal estate, be disposed of as follows, viz: $10,000 to be kept invested during the lifetime of his widow, for her benefit, and the residue of the fund to be distributed equally to and among the testator's children and two grandchildren, viz: one seventh each to James M. Broom, Ann Littler, Hetty W. Lyon, Sarah Roberts, Lavinia Broom and Jacob P. Broom, and one seventh to the two grand children, John and Rachel

Roberts. The shares of James M. Broom and Ann Littler were bequeathed to them absolutely, but the other shares were all to be invested, and held upon certain trusts for the benefit of the several legatees. The testator further provided that, at the decease of his widow, a dwelling house, which he had devised to her for her lifetime, should also be sold, and that the proceeds thereof, together with the capital of $10,000 before directed to be invested for her benefit, should be disposed of in like manner as before provided touching the residue of the fund first directed to be raised. James M. Broom was appointed the executor and trustee. After the death of the testator, April 26th, 1810, James M. Broom, the executor and trustee, took letters testamentary and possessed himself of the estate. He passed sundry testamentary accounts, the last of which was on the 7th of May, 1816, and showed a balance in his hands of $52,925.48, applicable to the trusts of the will. Broom, while executor and trustee, purchased a considerable body of real estate, taking the deeds in his own name, without mention of any trust. About the year 1826, Broom, becoming embarrassed in his circumstances and indebted in sundry judgments of large amount, which were liens upon the real estate, executed an assignment of the real estate, bearing date May 31st, 1826, to John Lowber, in trust to convert the same into money and apply the proceeds in payment of the unsatisfied legacies bequeathed by Jacob Broom, deceased, to his children and grand children, or, should there be a deficiency of proceeds to pay the whole, then to apply the same *pro rata*.

The bill was filed by Thomas Roberts as the administrator of Lavinia Roberts, deceased, who was one of the children of Jacob Broom and a legatee under the will, and by the other complainants as the surviving children of Hetty W. Lyon, another of the said children and legatees, who at her decease became entitled to her share under the

trusts of the will.   It was alleged that the other legacies had been paid, or nearly so ; and, consequently, the persons who would have been entitled to the other legacies, supposing them to be unpaid, were made parties defendant, together with Broom, the executor and trustee,—also Lowber, the assignee in trust, and sundry judgment creditors of Broom, viz :   The Bank of Delaware, the Bank of Wilmington and Brandywine, the administrators of John Bellah, deceased, the executors of Joseph Tatnall, deceased, and the executors of James Jefferis, deceased.   The judgments of these defendants were recovered between the purchase of the real estate by Broom and his assignment of it.

The bill charged that the real estate purchased by James M. Broom, and which was part of the property assigned by him in trust, had been paid for by Broom out of the trust funds ; that the assignment so admits, and expresses the assignor's intention that the real estate, so purchased and paid for out of the trust funds, should be held as a security for the legatees.   The bill seeks to affect this real estate with a trust in favor of the legatees, and claims that such trust has priority against the judgments recovered against Broom before the execution of the assignment.   The prayer was for a discovery, and that the real estate be charged with the unpaid legacies of the complainants in preference to the judgments.

A decree *pro confesso*, was taken against James M. Broom, for want of an answer   The real defendants, i. e. the creditors of Broom, answered, admitting the general state of facts alleged in the bill, except the charge that Broom purchased the real estate with the funds of the testator,—as to which they put the complainants upon proof.   They also insisted upon their legal rights, as judgment creditors whose debts were incurred without notice of the equity now set up.

Pending these proceedings, the real estate in controversy was sold ; part, under an execution at law, and the residue,

under an order of the Chancellor, by consent; and the pro-
ceeds, after paying the execution at law, were brought into
this Court to abide the decree in the cause.   The proceeds.
not being sufficient to satisfy both the legacies and the
judgments, the question now raised was which should be
first paid.

The cause was put at issue, and came before the Chan-
cellor, at the July Term, 1831, for a hearing upon the
bill, answer and exhibits, without depositions.

*Black* and *Rogers*, for the complainants.

This case presents two questions.

1st.  Was there a resulting trust of the real estate to the
legatees ?

It is a settled principle in equity, that if a trust fund
be applied by the trustee to the purchase of real estate,
and the title be taken in his own name, the trusts of the
fund attach to the real estate.   A use results, by operation
of law, to the *cestui que trust.*   So rigorous is this rule that
by no artifice can it be evaded, if the fund can in any way
be traced.   Into whatever it may be converted, whether
into real or personal estate, the *cestui que trust* may, at his
election, look beyond the personal responsibility of the trus-
tee, and enforce the trust against the property purchased.
The authorities to this point are numerous and conclusive.
*Wilson's R.* 400–402; 1 *T. R.* 619–623; 1 *Salk.* 161; 5
*Ves. Jr.* 169; 10 *Johns. R.* 63; 3 *Johns. R.* 216; 1 *Johns.*
*Cas.* 205; *Ambler,* 409; 3 *Binn. R.* 302.   Such a trust
need not be evidenced by writing.   It results from the
fact that the trust fund was used in the purchase, and that
fact may be proved by any species of evidence,—by parol
as well as written.   *Ambler,* 409 : 2 *Bro. Ch. Rep.* 290; 1
*Dall. R.* 193; 2 *Washington's Rep.* 441–445.   The Court
will, of course, exercise caution and require satisfactory

proof, 3 *M. & S.* 574; but the proof of such a trust is held to be abundant, if either (1st.) the trustee admits in his answer that he used the trust fund in the purchase; or, (2d.) if otherwise it is admitted under the hand of the trustee. How is the use of the trust fund for the purchase of this real estate established in the present case? We say, first, by fair presumption. The trustee had in his possession at the time a large trust fund, some $15,000.00, of which he was entitled to only one seventh. No other means of purchase are shown. It is presumable that he purchased with this fund. But the case presents specific proof of the use of the trust funds; 1st, as to Broom, the trustee, the bill is taken *pro confesso*; and, so far, that is an admission of the fact on the record; and, 2d, the recital in the assignment by Broom is direct proof. It is a declaration that the lands were purchased with the trust fund and were intended to be a security for the legatees. 2 *Washington's R.* 445; *Ambler*, 413.

2nd. Is the equitable lien of the legatees preferred to the judgment against Brown?

Under the English decisions equitable liens avail against all claims but that of a purchaser for a valuable consideration and without notice. A well known example of such equitable liens is the case of a lien for unpaid purchase money. A trust resulting from the use of a trust fund in the payment of purchase money stands upon as strong a ground. Equitable liens, generally, are held good as against mere judicial liens, or rights arising by operation of law subsequently attaching. Hence, they have been preferred to the claims of assignees or creditors under assignments in bankruptcy. *Sugd. on Vend.* 364 : 1 *Madd. Ch. Pr.* 456. The same preference has been adjudged to equitable liens as against judgments. *Finch*, 63 : 1 *P. Wms.* 277 : 3 *Ves. Jr.* 576 : 1 *Paige's Ch. R.* 125. The principle is, that an assignment in bankruptcy, or a judgment, operates only upon the interest actually held by the

debtor, and so must be taken subject to all equities which have attached to it.    In Delaware the question is new ; but, in the absence of judicial decisions, the English doctrine must be taken to apply.

The case of a judgment is distinguished from that of a mortgage.   A mortgagee is treated as a purchaser, and acquires by his mortgage, and by the advance of the money secured by it, the superior equity of a purchaser for a valuable consideration.   Not so a judgment creditor.   The land is not a specific security for the judgment, on the faith of which the debt is presumed to have been contracted.   The judgment is but a general lien, giving a right to enforce its collection against such interest as the debtor may have in land, but raising no equity in the creditor superior to equities existing in the land prior to the recovery of the judgment.

If a use resulted to the legatees at the time of the purchase, they have done nothing since to prejudice their claim.   There have been no laches or acquiescence.   The lands were purchased in 1814 and 1816.   Broom continued to pay some of the legatees until his failure.   There was no reason to complain.   With respect to notice, if any notice were necessary, the creditors must be presumed to have had notice, from Broom's testamentary accounts, that he was, at the time of the purchase, a trustee with trust funds in his hands.

*Wales* and *Read, Jr.*, for the judgment creditors.

1. Was there any trust of these lands ?

It is certain that there was no express trust created by the will or pursuant to its provisions.   The direction is not for an investment in real estate to be held in trust, but that lands of the testator be converted into money; and the bequest is of a personal fund.   The very evidence relied on, viz : the recital in the assignment, negatives a

purchase in trust. It shows that Broom purchased the lands for himself, and afterwards, becoming embarrassed, sought by the assignment to subject it to the legacies.

But, it is contended that this is a trust resulting, by operation of law, from the fact that the lands were purchased with the trust fund. We deny that such was the fact. The evidence relied on to prove it, whatever might be its force against Broom, cannot affect these creditors. The taking of the bill *pro confesso* as to Broom raises no admission against the other defendants. So, the declaration of Broom, made in the recital of the assignment after he had become embarrassed, for the purpose of securing the legatees, is not admissible to the prejudice of honest creditors who had previously recovered judgments against the lands assigned. But, assuming the fact to be as is insisted upon, what does it amount to ? only that Broom, having in his hands a mixed fund, his own money and that of the legatees, employs the whole in purchasing real estate for himself. Money has no ear mark. The fund was entire and cannot be separated. What part of it was held by Broom in trust cannot be traced, and hence no use can result from the application of it. The doctrine of resulting trusts does not apply here, but only to the case of a person who, having received money from another to purchase land for the owner of the fund, buys and takes the title in his own name. 1 *Atk.* 159 : *Prec. in Ch.* 163, 168, 184.

2. But supposing there was a resulting trust, as between the legatees and Broom, does it follow the lands against the creditors ?

The distinction, in the English cases, between judgments and mortgages does not obtain in this country. In England, lands cannot be sold in execution of a judgment. Here, a judgment stands on higher ground. Under our law, it is as much a lien on lands as is a mortgage. The latter, though a conveyance in form, is in substance but a

security for the debt, binding the land mortgaged.  A judgment is also a security quite as effectual.  The only substantial difference is, that one is a specific lien while the other is a general lien.   Chief Justice Marshall, in 7 *Wheat. R.*, 46, denies the distinction here set up between judgments and mortgages.  The doctrine which governs this case is that settled in the Supreme Court, in *Barclay vs. Greenly,* 7 *Wheat. R.* 56, that secret equities or trusts shall not avail to prejudice honest creditors without notice. In this country, the law does not favor such claims.  They operate as a fraud on creditors, who have advanced their money on the faith of visible property in the debtor and without notice of claims against it.   This general principle is sufficient to control the present case.   But the hardship of this claim and its operation as a legal fraud on the creditors is aggravated by the special circumstances.  The legatees lie by and permit Broom to hold the property for a number of years, resting upon the personal responsibility of the trustee until he becomes embarrassed, and then for the first time they seek to set up a trust in the real estate against creditors who, meanwhile, without any notice, have advanced their money and recovered judgments.

It is like the ordinary case of a person having an equity or lien upon property, who stands by silently and sees another purchase.  He loses his equity.  *Ambler,* 633. So here, as between these creditors and the legatees, the equity is in favor of the creditors, whatever use might be supposed to have resulted as against Broom.

JOHNS, SR., CHANCELLOR.—The two important questions arising are,

1st. Had the complainants an equitable lien on the real estate of James M. Broom ?

2nd. If they had, is this equitable lien to be preferred to the legal liens of the creditors of James M. Broom ?

1. The first question depends on facts as well as law. As to the facts—It is contended that the lands of James M. Broom, though purchased in his own name, were purchased with money belonging to the legatees of Jacob Broom, in the hands of James M. Broom their trustee. The sufficiency of the proof is denied; and hence, the Court is called on to decide important questions of fact.

The case must be considered as twofold; 1st, as a controversy between the complainants and James M. Broom, their trustee, and his assigns; and 2nd, as a controversy between the complainants, as legatees, and the judgment creditors of James M. Broom. It is the same in effect as if the controversies were embraced in two suits. Proof which would be not only competent but satisfactory to establish a trust as against James M. Broom, and his assigns, may be incompetent, and if competent not to be credited or not satisfactory, when used to establish a trust estate in the lands of James M. Broom, so as to affect the rights of his judgment creditors.

Now,—without deciding whether the declarations of James M. Broom in the assignment, or the facts stated in the bill which are to be taken to be confessed by James M. Broom, are *competent* evidence against his judgment creditors,—it will be sufficient to say that, in the opinion of the Chancellor, the evidence is not satisfactory to prove the investment of the money of the legatees in the lands purchased by James M. Broom. There is no certainty as to the question what money or funds were so invested. The Chancellor must judge of the credibility of the evidence, as well as of its competency; but, admitting the latter, he is not convinced of the investment of the funds of the legatees. It is probable that the means which James M. Broom derived from his father's estate enabled him to raise money to make the purchase of the lands, but how or to what extent is not proved. With respect to the law

of trust, as the facts are not proved, it is unnecessary for the Court to express any opinion.

2. But, suppose a trust to be established as between the legatees and Broom, the decisive question in this cause remains; that is, whether the equitable lien on the lands held in trust should be preferred to the legal liens of the creditors of James M. Broom? Must his judgment creditors be postponed, and the equitable lien of the legatees be first paid out of the proceeds of the sales of James M. Broom's lands?

The principal ground on which the counsel for the complainants rest, for the support of the affirmative of this question, is that there is a distinction between mortgages and judgments. It is admitted that, by the English authorities and under the laws of Delaware, a mortgage will be preferred to an equitable lien. But it is contended that judgments stand on a different ground; that one is a specific and the other a general lien; that a mortgagee is a purchaser, while a judgment creditor has no title to the land but only a right to sell it; that is, to sell such an interest in the land as the debtor has, which, it is argued, is an estate subject to the equitable lien. It is said that there are no decisions here, and that we must resort to English authorities, by which it appears such an equitable lien will be preferred to a judgment.

That there is some difference between a mortgage and a judgment is true; but, that there is a rule of law in Delaware that a judgment shall be postponed and an equitable lien on land be preferred, is not known to the Chancellor. For half a century he believes the law has been considered to be otherwise. The absence of decisions here to establish such a rule is strong negative evidence that no such rule of law has existed. It is not pretended that, at law, any such rule exists, but that this is a principle of equity. In England, where lands cannot be sold for the payment of debts, and the creditor has no

legal means by a sale of the land to make his debt, such a principle of equity may be founded on reason and justice; but here, such a rule cannot be applied without violating one of the first principles of equity, to wit; that when two persons stand in equal equity, a Court of Chancery will not interfere.

It may be argued that the judgment creditor in Delaware has no legal remedy,—that he can only sell the land subject to the equitable lien. But such is not the law. In the case of *Vickory vs. The State*, in the Court of Appeals, at June Term, 1828, the law as to the legal effect of a sheriff's sale on a junior judgment was settled. It was there decided, that the sheriff's sale did discharge the land from all prior incumbrances excepting mortgages. In the earlier case of *Lewden vs. Sawyer*, the same principle had been recognized in the Court of Appeals and similar decisions had been made in the Supreme Court. By the Act of Assembly (*Digest Del. Laws*, 205) the sheriff's sale does pass the same title, that is to say, in the words of the Act, " such estate or estates" as the debtor had. The judgment creditor, therefore, has a legal remedy, and this Court will not interfere to destroy or defeat it.

There is another ground on which the Court ought not to interfere between the claimants and James M. Broom's judgment creditors. If any equitable lien existed it was a secret, invisible lien, unknown to the creditors who trusted James M. Broom on the credit of his visible property; and, therefore, it would be inequitable for this Court to aid in preventing the judgment creditors from recovering their debts.

I can perceive no substantial difference between the position of a *bona fide* purchaser from James M. Broom, without notice, or a mortgagee, and that of the judgment creditors. It is the policy of our laws to protect purchasers and creditors, without notice, against secret trusts. To support the secret equitable lien here set up (if one does exist)

against judgment creditors would be to violate the policy of our law, and would open a wide field for defrauding creditors. I am of opinion that the judgment creditors are to be first paid out of the sales of the land, and that the surplus only should be distributed among the legatees.

Let a decree be entered accordingly.